1
2
3
4

Marc Weitz (SBN 242830)
633 West 5th Street, Suite 2800
Los Angeles, CA 90071
(213) 223-2350
Fx: (213) 784-5407
marcweitz@weitzlegal.com
Attorney for: Lucky Dog Pizza, LLC & D&M Restaurant Group, Inc.

5
6
7
8
9

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

10
11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| In re:<br><br>WEENEEZ, LLC<br><br>        Debtor. | CASE NO. 2:10-bk-58946-ER<br><br>Assigned to the Honorable Ernest M. Robles<br><br>Chapter 7<br><br>**MOTION FOR PERMISSION TO PROCEED WITH AVOIDANCE ACTION AND FOR ATTORNEY'S FEES AND COSTS TO BE PAID BY THE BANKRUPTCY ESTATE**<br><br>DATE: September 21, 2011<br>TIME:  10 a.m.<br>Courtroom: 1568<br>Roybal Federal Building<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

21
22
23
24
25
26
27
28

TO THE HONORABLE ERNEST M. ROBLES, CREDITOR SETSU CARTER, PRISM VENTURES HOLDINGS, LLC AND THE UNITED STATES TRUSTEE:

PLEASE TAKE NOTE THAT that Lucky Dog Pizza, LLC (formerly Lucky Dog Pizza, Inc.) (both referred to as "Lucky Dog") & D&M Restaurant Group, Inc. ("D&M"), Creditors in the above-captioned case, hereby files this Motion For Permission to Proceed with an avoidance action, under 11 U.S.C. § 548 (a) (1) (A), 11 U.S.C. § 548 (a) (1) (B), and 11 U.S.C. § 547 (b)

against Creditor Setsu Carter ("Carter") and Prism Ventures Holding, LLC ("Prism"), and for attorney's fees and costs associated with this action to be compensated by the bankruptcy estate.

This Motion is based on the attached Memorandum of Points and Authorities, the Declaration of Marc Weitz, the Declaration of David McGrath, attached Exhibits, and on such other arguments as may be made by counsel at the time of the hearing.

This Motion is filed pursuant to *In re Gibson Group, Inc*. (6th Cir. 1995) 66 F3d 1436, 1438–1446; *Matter of Boerne Hills Leasing Corp.* (5th Cir. 1994) 15 F3d 57, 59–60, and 11 USC § 503(b)(3)(B).

The adversary proceeding was filed on August 16, 2011 as case number 2:11-ap-02634. ("Adversary Proceeding") Movants seek permission retroactively so that bankruptcy would not be closed and the Movants lose their opportunity to file suit. The complaint in the Adversary Proceeding will be amended to include Prism.

### Prayer

Movants respectfully ask the court for an order:

1. Giving Movants permission to proceed with adversary proceeding number 2:11-ap-02634;
2. Allowing Movants to recover legal fees and costs associated with Adversary Proceeding, subject to the court's approval of fees and costs, and subject to the court's approval of the employment of Marc Weitz as counsel to the Movants.

DATED:  August 22, 2011                Respectfully submitted,


                                       By: /S/ MARC WEITZ_____
                                       Marc Weitz
                                       Attorney for the Movants

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.     Introduction

3

4          On February 21, 2010, the Debtor, Weeneez, LLC, and Lucky Dog entered into an asset

5    purchase agreement whereby Debtor sold its business assets to Lucky Dog in exchange for

6    $77,500 cash, 49% of Lucky Dog's shares ("Shares"), an option to purchase 49% of the shares of

7    D&M ("Option"), an $8,000 note payable to the Debtor due 180 days after closing, a $112,500

8    note payable to the Debtor ("Note 1"), and a $27,000 note payable to the Debtor ("Note 2").

9    Collectively ("Transferred Assets").

10         On July 2, 2010, Lucky Dog and D&M signed agreements with Setsu Carter which

11   essentially transferred the Option, Note 1, and Note 2 from the Debtor to Setsu Carter; and

12   transferred the Shares to Prism. Setsu Carter is the mother of Sid Carter. Sid Carter is the CEO

13   and managing member of the Debtor. Setsu Carter is also the Managing Member of Prism. There

14   does not appear to be a specific instrument between the Debtor and Prism or Setsu Carter that

15   transferred the Transferred Assets, but the agreements signed on July 2, 2010 make clear that the

16   Transferred Assets now belong to Setsu Carter and Prism. It does this by making Lucky Dog and

17   D&M, as promissors of the Notes, sign agreements that the Notes will now be paid to Setsu

18   Carter, that the Option belongs to Setsu Carter, and gives Prism the Shares: a 49% stake in

19   Lucky Dog. There is no evidence that consideration was paid by Setsu Carter or Prism to the

20   Debtor for this transfer. It is also possible that the transfers were made in consideration of a

21   $320,000 debt owed by the Debtor to Setsu Carter. This would be a preference.

22         On November 15, 2010, Debtor filed for bankruptcy in this above-referenced case. The

23   Debtor lists the sale of its business assets to Lucky Dog in item 10 of its Statement of Financial

24   Affairs, but fails to mention the subsequent transfer of the Shares, Option, Note 1, or Note 2 to

25   Setsu Carter. Further, the Debtor fails to list the Shares, Option, Note 1, or Note 2 under assets in

26   its Schedule B.

27         It is clear that these transfers from the Debtor to Sid Carter's mother, Setsu, were either a

28   fraudulent transfer, with no consideration, to hide these bankruptcy estate assets, or a preferential

1    transfer from the Debtor to Sid Carter's mother, in consideration of Setsu Carter's debt. In either

2    case, both these transfers are avoidable under bankruptcy law.

3        Movants file this action on their own because the Trustee or Debtor has not taken action.

4    It is crucial, that Lucky Dog, as the promissor on Notes 1 & 2, know to whom the notes belong

5    in order to make payments to the correct party or face legal liability or wasted payments. Further,

6    Lucky Dog needs to determine who owns the 49% shares in its company. Lucky Dog has

7    responsibilities to its shareholder regarding voting rights, distribution of profits, coverage of

8    expenses, etc. D&M, for the same reasons, needs to determine who owns the Option to its shares.

9        Both Lucky Dog and D&M are Creditors of the estate; a determination that the

10    Transferred Assets are part of the bankruptcy estate benefits the whole estate: the Movants and

11    all unsecured creditors. It is for all these reasons that the Adversary Proceeding is necessary and

12    will provide a benefit to the estate. This is a clear-cut case of a fraudulent transfer and/or

13    preferential transfer. This is why Movants respectfully asks the Court to proceed with its

14    Adversary Proceeding and to recover its legal fees and costs from the bankruptcy estate.

15

16                        II.    Authority

17

18    *1.*  Under certain circumstances, the court may authorize an individual creditor to file an

19        avoidance action on the estate's behalf—e.g., where there is no creditors' committee or

20        the committee and debtor refuse to file the action. *See In re Gibson Group, Inc. (6th Cir.*

21        *1995) 66 F3d 1436, 1438–1446; Matter of Boerne Hills Leasing Corp. (5th Cir. 1994) 15*

22        *F3d 57, 59–60.*

23    *2.*  Provided court permission is obtained to proceed with the action, a creditor filing an

24        avoidance action on the estate's behalf may be entitled to an administrative expense claim

25        for reimbursement of fees and expenses. *See 11 USC § 503(b)(3)(B).*

26    3.  The creditor is not required to obtain permission to proceed before the action itself is

27        filed. *In re Hashim (9th Cir. BAP 2007) 379 BR 912, 921–922.*

28

---

**MEMORANDUM OF POINTS & AUTHORITIES**

4. 11 U.S.C. § 548 (a) (1) – Fraudulent Transfer - The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

    a. (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

    b. (B)

        i. (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

        ii. (ii)

            1. (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

            2. (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

            3. (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

            4. (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

5. 11 U.S.C. § 548 (b) – Preferential Transfer - the trustee may avoid any transfer of an interest of the debtor in property—

    a. (1) to or for the benefit of a creditor;

---

b.  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

c.  (3) made while the debtor was insolvent;

d.  (4) made—

  i.  (A) on or within 90 days before the date of the filing of the petition; or

  ii.  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

e.  (5) that enables such creditor to receive more than such creditor would receive if—

  i.  (A) the case were a case under chapter 7 of this title;

  ii.  (B) the transfer had not been made; and

  iii.  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

III.    Facts

1.  On February 21, 2010, the Debtor, Weeneez, LLC, and Lucky Dog entered into an asset purchase agreement whereby Debtor sold its business assets to Lucky Dog in exchange for $77,500 cash, 49% of Lucky Dog's shares ("Shares"), an option to purchase 49% of the shares of D&M ("Option"), an $8,000 note payable to the Debtor due 180 days after closing, a $112,500 note payable to the Debtor ("Note 1"), and a $27,000 note payable to the Debtor ("Note 2"). Collectively ("Transferred Assets"). *See Asset Purchase Agreement at Exhibit A.*

2.  On July 2, 2010, Lucky Dog and Prism signed a new operating agreement giving Prism a 49% stake in Lucky Dog. This was the 49% stake, or Shares, that had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶1 supra and Exhibit A. *See Operating Agreement at Exhibit B.*

3.  On July 2, 2010, Setsu Carter and D&M signed a "First Amendment to By-Laws of D&M Restaurant Group, Inc.," declaring that Setsu Carter was now the holder of Note 1. Note 1 had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶1 supra and Exhibit A. *See "First Amendment to By-Laws of D&M Restaurant Group, Inc." at Exhibit C.*

4.  On July 2, 2010, Setsu Carter and Lucky Dog signed "Exhibit 5 to Lucky Dog Pizza, LLC Operating Agreement," declaring that Setsu Carter was now the holder of Note 2. Note 2 had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶1 supra and Exhibit A. *See "Exhibit 5 to Lucky Dog Pizza, LLC Operating Agreement" at Exhibit D.*

5.  On July 2, 2010, Setsu Carter and Lucky Dog signed "Exhibit 2 to First Amendment to By-Laws of D&M Restaurant Group, Inc.," declaring that Setsu Carter was now the holder of the Option. The Option had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶1 supra and Exhibit A. *See "Exhibit 2 to First Amendment to By-Laws of D&M Restaurant Group, Inc." at Exhibit E.*

6.  Setsu Cater is the mother of Sid Carter.

7.  Sid Carter is the managing member and CEO of Debtor. *See the Declaration of David McGrath at ¶9.*

8.  D&M and Lucky Dog are creditors of the Debtor. *Id at ¶10.*

9.  On November 15, 2010, Debtor filed for bankruptcy in this above-referenced case. *See docket #1.*

10. The Debtor lists the sale of its business assets to Lucky Dog in item 10 of its Statement of Financial Affairs, but fails to mention the subsequent transfer of the Shares, Option, Note 1, or Note 2 to Setsu Carter. *See Statement of Financial Affairs, docket #10, pages 19 – 26.*

11. The Debtor fails to list the Shares, Option, Note 1, or Note 2 under assets in its Schedule B. *See Schedule B, docket #10, pages 5 – 7.*

IV.    Analysis

This is a clear-cut case of a fraudulent transfer or preference, depending on whether the Transferred Assets were transferred in consideration of Setsu Carter's debt. Here the Transferred Assets were transferred from the Debtor to Prism, a company owned and run by Setsu Carter, and Setsu Carter as an individual. Setsu Carter is the mother of Sid Carter, the CEO and managing member of the debtor. This transfer took place just 4 ½ months before the Debtor filed this bankruptcy and while it was insolvent. If these assets were transferred for no consideration to hide them, then this is a fraudulent transfer. If it was in consideration of Setsu Carter's debt, then it's a preference. Both are avoidable. The transfer was not listed on the Debtor's Statement of Financial Affairs, therefore it appears that these assets were being hidden. As a result, these transfers need to be avoided and the Transferred Assets declared to be part of the bankruptcy estate.

The Movants are both creditors of the estate by virtue of an indemnity agreement, giving them standing to sue under existing case law. Further, Movants argue they have standing to sue as promissors on Notes 1 & 2, as the subject of the Shares for Lucky Dog, and as the subject of the Option for D&M. It is vital that the Court determine to whom Movants must make payments on the Notes, who owns Lucky Dog's Shares, and who owns D&M's Option. Otherwise Movants may not pay the correct party and shareholders voting and other rights may be affected if they are not held by the proper party. Movants contend that the Transferred Assets properly belong to the bankruptcy estate and not Setsu Carter or Prism. Therefore this suit benefits the entire estate: Movants and all the unsecured creditors.

After months of attempted discussions between the Movants and the Trustee, the Trustee has not been able to give this matter the attention it deserves. Further, Movants approached Setsu Carter and Prism and asked that the assets be voluntarily transferred back to the bankruptcy estate to avoid litigation. A deadline was given, but she and her attorney refused. As such, Movants bring this action on their own, due to its importance in size to the bankruptcy estate.

Movants have filed the Adversary Proceeding before the bankruptcy was closed and the opportunity was lost.


V.      Conclusion


As per the facts and authorities cited, this is clearly a fraudulent or preferential transfer that should be avoided. The Transferred Assets properly belong to the bankruptcy estate. As such, this lawsuit benefits the entire the bankruptcy estate. Under case law, Movants as creditors have standing to sue. Therefore, Movants respectfully ask the court for an order to allow them to proceed with the Adversary Proceeding and for attorney's fees and costs to be paid by the bankruptcy estate.


DATED:  August 22, 2011                Respectfully submitted,


                                       By: /S/ MARC WEITZ_____
                                       Marc Weitz
                                       Attorney for Movants

1

2

3                  **<u>DECLARATION OF DAVID MCGRATH</u>**

4

5          DAVID MCGRATH declares:

6

7          *1.*   I am the CEO and Managing Member of Lucky Dog Pizza,

8    Inc. ("Lucky Dog") & D&M Restaurant Group, Inc. ("D&M").

9

10         *2.*   By virtue of the foregoing, I have personal knowledge

11   of the facts set forth in this Declaration and, if called upon

12   as a witness, could and would testify completely to these facts

13   under oath.

14

15         *3.*   *Lucky Dog Pizza, Inc. later became Lucky Dog Pizza,*

16   *LLC. Both are referred to here as "Lucky Dog."*

17

18         *4.*   On February 21, 2010, the Debtor, Weeneez, LLC, and

19   Lucky Dog entered into an asset purchase agreement whereby

20   Debtor sold its business assets to Lucky Dog in exchange for

21   $77,500 cash, 49% of Lucky Dog's shares ("Shares"), an option

22   to purchase 49% of the shares of D&M ("Option"), an $8,000 note

23   payable to the Debtor due 180 days after closing, a $112,500

24   note payable to the Debtor ("Note 1"), and a $27,000 note

25   payable to the Debtor ("Note 2"). Collectively ("Transferred

26   Assets"). I signed this agreement on behalf of Lucky Dog. *A*

27   *true copy is attached as Asset Purchase Agreement at Exhibit A.*

28

5.  On July 2, 2010, Lucky Dog and Prism Ventures Holdings, LLC ("Prism") signed an operating agreement giving Prism a 49% stake in Lucky Dog. This was the 49% stake, or Shares, that had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶4 supra and Exhibit A. I signed this agreement on behalf of Lucky Dog. *A true copy is attached as Operating Agreement at Exhibit B.*

6.  On July 2, 2010, Setsu Carter and D&M signed a "First Amendment to By-Laws of D&M Restaurant Group, Inc.," declaring that Setsu Carter was now the holder of Note 1. Note 1 had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶4 supra and Exhibit A. I signed this agreement on behalf of D&M. *A true copy is attached as "First Amendment to By-Laws of D&M Restaurant Group, Inc." at Exhibit C.*

7.  4.  On July 2, 2010, Setsu Carter and Lucky Dog signed "Exhibit 5 to Lucky Dog, LLC Operating Agreement," declaring that Setsu Carter was now the holder of Note 2. Note 2 had belonged to the Debtor as part of the Transferred Assets given as consideration for the purchase described in ¶4 supra and Exhibit A. I signed this agreement on behalf of D&M. *A true copy is attached as "Exhibit 5 to Lucky Dog, LLC Operating Agreement" at Exhibit D.*

8.  On July 2, 2010, Setsu Carter and Lucky Dog signed "Exhibit 2 to First Amendment to By-Laws of D&M Restaurant Group, Inc.," declaring that Setsu Carter was now the holder of

---

DECLARATION OF DAVID MCGRATH

2

1    the Option. The Option had belonged to the Debtor as part of
2    the Transferred Assets given as consideration for the purchase
3    described in ¶4 supra and Exhibit A. I signed this agreement on
4    behalf of Lucky Dog. *A true copy is attached as "Exhibit 2 to*
5    *First Amendment to By-Laws of D&M Restaurant Group, Inc." at*
6    *Exhibit E.*

7       9.    D&M and Lucky Dog are creditors of the Debtor as per
8    an indemnity agreement signed on July 2, 2010. *A true copy is*
9    *attached at Exhibit F.*

10
11   I Declare under penalty of perjury under the laws of the United
12   States of America that the foregoing is true and correct and that
13   this Declaration was executed on August 22, 2011 at Los Angeles,
14   California.

15
16                                          David McGrath
17
18
19
20
21
22
23
24
25
26
27
28
                          DECLARATION OF DAVID MCGRATH

                                      3

1

2

3                       **<u>DECLARATION OF MARC WEITZ</u>**

4

5              Marc Weitz declares:

6

7       1.   I am the attorney for Lucky Dog Pizza, LLC ("Lucky

8    Dog") & D&M Restaurant Group, Inc. ("D&M"). I am licensed to

     practice law in the state of California and before this court.

9

10      2.   By virtue of the foregoing, I have personal knowledge

11   of the facts set forth in this Declaration and, if called upon

12   as a witness, could and would testify completely to these facts

13   under oath.

14

15      3.   On March 21, 2011, I e-mailed the trustee, John

16   Menchaca, and informed him of my belief that there had been

17   fraudulently or preferentially transferred assets in the

18   Weeneez, LLC bankruptcy. Attached to this e-mail was

19   documentary evidence.

20

21      4.   On April 21, 2011, I spoke to Setsu Carter's former

22   attorney, Scott Whitman, and made him aware of the fraudulent

23   and preferential transfer issues.

24

25      5.   On May 17, 2011, an in-person meeting took place

26   between myself, Scott Whitman, David McGrath, Setsu Carter, and

27

28
─────────────────────────────────────────────
                    DECLARATION OF MARC WEITZ

                              1

1    her husband. Nothing was resolved regarding the Transferred

2    Assts.

3

4        6.    On June 29, 2011, I drafted a complaint for the

5    avoidance of the fraudulent or preferential transfer and e-

6    mailed it to John Menchaca and Scott Whitman.

7

8        7.    On July 19, 2011, I spoke with Christopher Olmstead,

9    who called me saying that he was Setsu Carter's new bankruptcy

10   attorney to discuss the draft complaint. He said that he would

11   speak to his clients but never got back to me.

12

13       8.    On August 1, 2011, I e-mailed Christopher Olmstead and

14   cc'd John Menchaca stating that I have had no response to my

15   draft complaint and since time was running out for my client to

16   file suit, I gave the Carters a two-week deadline until August

17   15, 2011 at 5pm to turnover the Transferred Assets to the

18   bankruptcy estate or we would file suit.

19

20       9.    On August 2, 2011, I was contacted by Michael

21   Raichelson, who said he was Setsu Carter's new bankruptcy

22   attorney. He said he would get back to me by the deadline. I

23   never heard from him.

24

25       10.    On August 15, 2011, the deadline passed without a

26   response from Setsu Carter. I filed the Adversary Proceeding

27   the next day.

28

DECLARATION OF MARC WEITZ

2

I Declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on August 22, 2011 at Los Angeles, California.

<div align="right">
___/s/ Marc Weitz_____<br>
Marc Weitz
</div>

# EXHIBIT A



**PRUDENS**
BUSINESS ADVISORS

8350 Wilshire Blvd., Suite 200
Beverly Hills, CA  90211
Ph: 310-622-8777  Fax: 310-733-5448
www.prudens.biz

# *Purchase Agreement For Business Assets*

This is an agreement for the purchase and sale of business assets. In consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**Date:** Feb. 21, 2010

1.   DEFINITIONS:  The following definitions and designations shall apply:

BUSINESS:
WEENEEZ, LLC
500 SOUTH SPRING STREET
118 WEST 5TH
LOS ANGELES, CA 90013

| | |
|---|---|
| BUYER:<br>LUCKY DOG PIZZA, INC.<br>8640 GULANA AVE.<br>PLAYA DEL REY, CA 90293 | SELLER:<br>WEENEEZ, LLC<br>500 SOUTH SPRING STREET<br>118 WEST 5TH<br>LOS ANGELES, CA 90013 |
| BUYER'S BROKER:<br>SELF REPRESENTATION | SELLER'S BROKER:<br>PRUDENS BUSINESS ADVISORS<br>8350 WILSHIRE BLVD., SUITE 200<br>BEVERLY HILLS, CA 90211 |
| AGENT'S NAME:  N/A | AGENT'S NAME:  AZI MANOUSSI |

CLOSING: The closing of the asset sale and purchase transaction contemplated by this agreement, including without limitation the disbursement to Seller of funds held in escrow.

2.   SALE OF BUSINESS ASSETS: Seller agrees to sell the Business Assets to Buyer and Buyer agrees to purchase the Business Assets from Seller for the price and on the terms and conditions set forth below.

3.   BUSINESS ASSETS: Except as otherwise provided in this paragraph, the sale shall include all the assets of the Business, including but not limited to, any equipment, trade fixtures, leaseholds, leasehold improvements, contract rights, business records (with Seller retaining a reasonable right of inspection), licenses, franchises, goodwill, trade secrets, trade names, telephone numbers, supplies, work in progress and certain inventory. Notwithstanding the forgoing the sale shall not include accounts receivable, accounts payable, bank accounts, deposits, cash, financial records (however Buyer shall have a right to make copies prior to Closing), limited liability company documentation of Weeneez, LLC (for example, its operating agreement), business records of assets, liabilities, and contracts that are not included in the sale, the current lease between Seller and Security Building Loft Partners, L.P., or any trademarks or service marks of Weeneez or any rights therein or thereto or any goodwill associated therewith.

4.   PURCHASE PRICE: The purchase price shall be the sum of $225,000, (two hundred twenty five thousand US dollars) and shall be payable as follows:

a.   $   10,000            deposited by Buyer upon signing this agreement as part of the down payment. Broker is authorized to:
⌧   hold deposit check uncashed until escrow is opened OR

Buyer            Seller            Seller            Sell

☐ deposit check into escrow trust account or Broker trust account upon acceptance of offer.

b.  $    12,500          additional deposit upon opening of escrow

c.  $    55,000          to be deposited in escrow two business days before Closing
(Estimated escrow costs shall also be deposited)

d.      49%          (forty nine percent) of the shares of Buyer to be transferred to Seller (or to Seller's owners, at Seller's election)

e.  D&M Option          an option to purchase a 49% (forty nine percent) of the shares of D&M Corp. following the expiration of Seller's non-compete obligation under its agreement with R City on terms to be agreed by Buyer and Seller.

f.  $    8,000          Payable  180 days after Closing

g.  $  112,500          in the form of a non-negotiable promissory note earning interest, payable from profits of the restaurant, bar and/or lounge business managed by D&M Corporation at the 118 West 5th Street space in customary form with right of offset, issued by D&M Corporation to the benefit of Seller or Seller's designee, payable to Seller or Seller's designee in monthly installment payments to begin three months after Closing, secured by a security agreement and lien on the Business Assets as described by the Seller, and incorporated into the appropriate corporate documentation of D&M Corporation or Buyer, as appropriate.

h.  $    27,000          in the form of a non-negotiable promissory note in customary form with right of offset, issued by Buyer to the benefit of Seller or Seller's designee, payable to Seller or Seller's designee in equal monthly installments, including 10% per annum interest computed from Closing, so as to fully amortize over 36 months (i.e., $  871 per month), payments to begin six months after Closing, with the right to prepay without penalty, secured by a security agreement and lien on the assets of the business as described by the Seller, and incorporated into the appropriate corporate documentation of D&M Corporation or Buyer, as appropriate.  If Buyer is a corporation or other business entity, the owners shall personally guarantee the obligations to the Seller under such promissory note.

5.  INVENTORY:

☒  The purchase price shall include salable inventory used for sales at 500 South Spring Street (i.e., the Weeneez restaurant) and shall not include inventory purchased by R City, Inc., located at 118 West 5th Street (i.e., The Must winebar) OR

☐  the salable inventory at cost shall be paid for at Closing in addition to the total purchase price above. Not withstanding the above, the inventory shall not exceed $          and the Buyer can reject any part of the inventory over that amount. The inventory count shall be made on Closing

☐  by Buyer and Seller OR

☐  by an independent inventory service, with the fees to be divided equally between Buyer and Seller. Work in progress shall be valued at the actual cost of material and direct labor incurred by Seller and reimbursed by Buyer in cash at closing.

6.  PURCHASE PRICE ALLOCATION:  Buyer and Seller shall allocate the purchase price among the assets to be purchased before Closing.

7.  CONDITIONS PRECEDENT TO CLOSING:  Closing shall be subject to the conditions precedent set out below in this paragraph. Pursuant to that certain Agreement Regarding Disbursement of Funds of approximately even date herewith, in the event that Disbursement Agent (as defined in such agreement) has not received a Notice of Closing (as defined in such agreement) complying with the terms of such agreement by 12:00 midnight ending March 31, 2010 and commencing April 1, 2010, Disbursement Agent shall promptly return all Purchase Price Funds (as defined in such agreement) and Closing Costs Funds (as defined in such agreement) to Buyer, without interest thereon.

a.  Buyer's inspection of and reasonable satisfaction with the assets, financial and other records, contracts, leases of the business and Seller's Disclosure Statement (see paragraph 18), which shall promptly be made available for Buyer's inspection.

Buyer          Seller          Seller          Sell

b.  Seller's reasonable satisfaction with the Buyer's qualifications to purchase and operate business successfully, written verification of Buyer's funds to cover the down payment, Buyer's creditworthiness and Buyer's Disclosure Statement (see paragraph 18). Adequate information shall promptly be made available to Seller.

c.  ☐  the written consent of the landlord to assignment of the existing premises lease OR

☒  the making of a new lease between the landlord and the Buyer that is acceptable to Buyer and the termination of the existing lease on terms acceptable to Seller.

d.  Execution of promissory notes regarding items 4.g and 4.h above.

e.  Execution of a business management agreement between Buyer and Seller regarding the management of the restaurant at 500 South Spring Street and operation and curation of The Julie Rico Gallery.

f.  Execution of all documents necessary for the transfer of 49% of the shares of Buyer to Seller.

g.  Execution of an option to purchase a 49% (forty nine percent) of the shares of D&M Corp. following the expiration of Seller's non-compete obligation under its agreement with R City on terms to be agreed by Buyer and Seller.

h.  The total down payment of $77,500 having been made by Seller pursuant to items 4.a, 4.b., and 4.c and deposited in escrow.

i.  Execution of all documents necessary for the implementation of the transactions contemplated by this agreement.

j.  No injunction or other order has been issued by a court or other entity having jurisdiction that would prevent, delay or inhibit the transactions contemplated by this agreement or any part of such transactions or the operation by Buyer of the planned business at 118 West 5th Street. The issuance of any such injunction or order shall not constitute a default or breach by Seller of this agreement.

k.  Securing from the California Department of Alcohol and Beverage Control of a temporary Type 41 license transfer from Seller to either Lucky Dog Pizza, Inc. or D&M Corporation, as designated by Buyer, and successful initiation of the process of permanent transfer the Type 41 license from Weeneez, LLC to the Buyer's designated transferee.

8.  ESCROW: The purchase price and closing adjustments shall be paid through an escrow to be established with a party acceptable to Seller and Buyer, the escrow holder. Separate escrow instructions may be signed to define the duties of the parties and the escrow holder. All parties shall cooperate with the escrow holder in performing any acts and completing any papers necessary to complete this transaction. The Broker is a party to the escrow as to the payment of any sales commissions and an irrevocable assignee of the sale proceeds to the extent of such commissions. Seller shall have the right to pay his attorneys' fees and expenses incurred up to such payment prior to Closing from funds deposited in escrow.

9.  REPRESENTATIONS & WARRANTIES OF SELLER: Seller, and its owners and agents, acknowledge and represent as follows, except as otherwise set forth herein:

a.  Seller is a limited liability company, duly organized, validly existing, and in good standing under the laws of the state of California. Seller has all requisite power to own and use all property owned and used by it and to carry on its business as currently conducted. Seller is adequately capitalized and is capable of performing its obligations under this agreement.

b.  The execution and delivery of this agreement by Seller and the incurrence and performance of its obligations hereunder and the consummation of the transactions contemplated hereby by Seller have been duly authorized by all requisite limited liability company action of Seller. Seller has full power, authority and legal right to execute and deliver this agreement, to incur and perform its obligations hereunder and to consummate the transactions contemplated hereby. This agreement has been duly executed by Seller and constitutes a valid and legally binding obligation of Seller enforceable in accordance with its terms.

c.  Seller is operating the business in material compliance with all applicable laws and contracts. This compliance will not be violated by this sale and the business will pass all applicable inspections upon Closing.

d.  There are no claims or investigations pending that Seller is aware of that would affect the business or assets being sold that have not been disclosed by Seller to Buyer.  Buyer hereby acknowledges that R City has indicated that it is considering pursuing arbitration against Seller.

Buyer          Seller          Seller          Sell

e.  All leases and contracts relevant to the ownership and operation of the business are complete and in effect, and there are no undisclosed amendments.

f.  All the financial information and statements furnished to Buyer are complete, accurate, prepared in a manner consistent with prior statements, and fairly present the financial condition of the business as of the dates stated on them.

g.  Since the date of the last financial statements furnished, there have been no material adverse changes in the aggregate in the assets, liabilities, revenues, expenses, or any other items shown on such statements.

h.  All assets currently used in the business are owned by Seller free from liens and encumbrances, will be paid off at Closing or will be assumed by Buyer, and they are in good and operable condition.

Seller warrants that these representations are true on the date of this agreement and as of Closing. Seller shall indemnify and hold Buyer and Broker harmless from any damage resulting from misrepresentations and/or concealment.

10.  REPRESENTATIONS & WARRANTIES OF BUYER: Buyer, and its owners and agents, acknowledge and represent as follows, except as otherwise set forth herein:

a.  Buyer is a corporation, duly organized, validly existing, and in good standing under the laws of the state of California. Buyer has all requisite power to own and use all property owned and used by it and to carry on its business as currently conducted. Buyer is adequately capitalized and is capable of performing its obligations under this agreement.

b.  The execution and delivery of this agreement by Buyer and the incurrence and performance of its obligations hereunder and the consummation of the transactions contemplated hereby by Buyer have been duly authorized by all requisite corporate action of Buyer. Buyer has full power, authority and legal right to execute and deliver this agreement, to incur and perform its obligations hereunder and to consummate the transactions contemplated hereby. This agreement has been duly executed by Buyer and constitutes a valid and legally binding obligation of Buyer enforceable in accordance with its terms.

c.  There are no claims or investigations pending that Buyer is aware of that would affect Buyer's ability to consummate the transactions contemplated by this agreement, to make the payments required by this agreement, or to operate the businesses planned by the Seller and Buyer that have not been disclosed by Buyer to Seller.

d.  All the information furnished to Seller is complete, accurate, and fairly presents the education, training, experience, knowledge, skill, professional achievements and financial wherewithal of Buyer and of David McGrath, as applicable.

e.  Since the date of the last information furnished, there have been no material adverse changes that would affect the truth or accuracy of any information provided by Buyer to Seller.

Buyer warrants that these representations are true on the date of this agreement and as of Closing. Buyer shall indemnify and hold Seller and Broker harmless from any damage resulting from misrepresentations and/or concealment.

11.  CONTINUITY: Pending Closing, the Seller shall continue to operate the business in the usual way, protect its assets and goodwill, allow the Buyer to make reasonable inspections, and maintain good relations with suppliers, customers, and employees.

12.  TAXES AND EXPENSES:

a.  Utilities, personal property taxes, other taxes, insurance, rent, payroll, vacation pay, and other expenses of the business not otherwise provided for in this agreement shall be prorated to Closing. Buyer shall reimburse Seller at Closing for facility lease deposits, if any, and other miscellaneous deposits transferred to Buyer.

b.  Except as otherwise noted in this agreement, each party shall pay when due all operating costs incurred while that party is in possession of the Business Assets and hold the other party harmless therefrom.

c.  Any license or franchise annual fees shall not be prorated and Buyer shall pay any franchise training costs, transfer or issue fees for permits and licenses required.

d.  The Buyer and Seller shall pay equally all transfer costs and escrow fees. Each party shall pay its own accountants, attorneys, and other advisors.

e.  The Buyer shall pay at Closing any sales tax assessed on the sale of the Business Assets.

Buyer          Seller          Seller          Sell

f.    Seller shall hold Buyer harmless from any liability to the California Employment Development Department, the
California Franchise Tax Board or the California Board of Equalization arising from the operation of the business prior
to Closing.

13. MISCELLANEOUS LEASES, ETC.: Seller shall make its best efforts to obtain assignments to Buyer of the following
contracts used in the operation of the business, and the Buyer shall assume obligation for them.

| | |
|---|---|
| ☐ Alarm system lease or maintenance agreement contract(s) | ☐ Other equipment lease(s) or purchase |
| ☒ Telephone system lease or purchase contract agreement(s) | ☐ Equipment or software maintenance |
| ☐ Vehicle lease(s) or purchase contract(s) | ☐ Music service contract |
| ☐ Vending machine contract(s) | ☐ Advertising contract(s), |
| ☒ Other:    Quality Waste Service contract, Butler Chemical contract | |

14. CLOSING DATE: The estimated date for Closing is March, 1, 2010. Buyer and Seller shall make their best efforts to
complete Closing on or before that date, but in the event that Closing by such date is not accomplished, Buyer and
Seller shall make their best efforts to complete Closing as soon after that date as possible.

15. **BROKER: Buyer acknowledges that Broker has furnished to Buyer financial and other information obtained
from Seller and other sources, the accuracy and completeness of which have not been verified by Broker. By
signing this agreement, Buyer is acknowledging that he is relying solely on his own inspection of the business,
its assets, financial statements, business records, contracts, any assumed liabilities, operational history,
future profitability and the representations by the Seller, and not by the Broker. Seller acknowledges that
Broker has made no representations concerning the Buyer's creditworthiness or ability to complete this
transaction or to successfully operate the business. By signing this agreement, Seller is acknowledging that
he is relying solely on his own investigation of the creditworthiness and business qualifications of Buyer and
not on Broker. Should any representations of Seller or Buyer be untrue, Buyer and Seller agree to look solely
to each other for relief, except in cases of willful misconduct, bad faith or fraud on the part of Broker. Buyer
shall release, hold harmless, indemnify, and defend Broker from any claims of Broker based on Buyer's
creditworthiness or qualifications.**

16. TRAINING:  Seller shall train Buyer in the operation of the Weeneez business pursuant to the business management
agreement.

17. COVENANT NOT TO COMPETE:  Seller shall not directly or indirectly carry on a similar business within a radius of
    5   miles of the business being sold, attempt to hire any existing employees of the business, solicit any customers of
the business nor assist anyone else except the Buyer to do so within these limits; nor have any interest, directly or
indirectly, in such business, except as an employee of the Buyer, for a period of 5 consecutive years from Closing. This
covenant shall become an asset of the business and may be transferred as part of any future sale of the business.

18. SELLER'S AND BUYER'S DISCLOSURE STATEMENTS:
    a.    Seller's Disclosure Statement
    ☒   Buyer has received and read the completed Seller's Disclosure Statement OR
    ☐   Seller shall provide to Buyer the completed Seller's Disclosure Statement within three days after acceptance.
    b.    Buyer's Disclosure Statement:
    ☒   Seller has received and read the completed Buyer's Disclosure Statement OR
    ☐   Buyer shall provide to Seller the completed Buyer's Disclosure Statement within three days after acceptance.

19. MEDIATION OF DISPUTES:  Buyer, Seller and all Brokers and agents involved in this transaction agree to and shall
mediate utilizing a neutral mediator for any dispute or claim between them arising out of this contract or any resulting
transaction. The mediation shall be held prior to any court action or arbitration. The mediation shall be confidential and
in accordance with the California Evidence Code. In the event the parties are not able to agree on a mediator within
thirty days of the first party seeking mediation, the presiding judge of the Superior Court of the county in which the
business is located shall have jurisdiction to appoint a mediator. In the event the mediator determines that a second
mediation session is necessary, it shall be conducted in accordance with this paragraph. Should the prevailing party
attempt an arbitration or a court action before attempting mediation, the prevailing party shall not be entitled to attorney
fees that might otherwise be available to it in a court action or arbitration, and in addition thereto, the party who is
determined by the arbitrator to have resisted mediation may be sanctioned by the arbitrator or judge. Mediation fees, if
any, shall be divided equally among the parties to the disputes. The following matters are excluded from mediation
hereunder: (a) a judicial or non-judicial foreclosure or other action or proceeding to enforce a security agreement or
deed of trust, (b) an unlawful detainer action, (c) injunctive relief to enforce paragraph 16, (d) any matter which is within
the jurisdiction of a probate or small claims court, or (e) an action for bodily injury or wrongful death, or for latent or

Buyer         Seller         Seller         Sell

patent defect to which Code of Civil Procedure §337.1 or §337.15 applies. Participation by Broker(s) or agent(s) in mediation shall not make them a party to this agreement.

20.  COMMISSION:  The Broker(s) identified in paragraph 1 has/have acted as the only Broker(s) for this sale and earned a commission. Seller agrees to pay a commission to Broker(s) for services as follows:

A total commission of $20,250 to Prudens Business Advisors, payable (a) on Closing, or (b) if completion of sale is prevented by default of Seller, upon Seller's default. If completion of sale is prevented by default of Buyer, the Buyer shall be responsible for and agrees to pay the total Broker commission immediately upon default. Any amount that the Buyer has deposited with the escrow holder may be applied against Buyer's obligation under this paragraph. In any action, proceeding or arbitration relating to the payment of such a commission, the prevailing party shall be entitled to reasonable attorney's fees and costs.

21.  INTERPRETATION:  The entire agreement of the parties relating to the sale of the Business Assets is set forth in this agreement and can only be modified in writing. This agreement shall bind and benefit the parties and their legal successors and shall supersede any prior written or oral agreements. This agreement may be signed in counterparts and faxed signatures shall be considered as originals. In any action, proceeding or arbitration between Buyer and Seller arising out of this agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs from the non-prevailing party. The headings of articles, sections, paragraphs, items or other subdivisions hereof are for convenience of reference only and shall not in any way affect the interpretation or construction of this agreement. Compliance with any provisions of this agreement may be waived only by an instrument in writing signed by the parties hereto. Any failure by any party hereto to enforce compliance with any provision hereof at any time shall not affect the right at a later time to enforce such compliance.

22.  ACKNOWLEDGMENT: By signing below, the Buyer and Seller each acknowledge that they have carefully read and fully understand this agreement and have received a copy of it. The undersigned warrant that their signatures are legally sufficient to bind the Buyer and Seller.

23.  PERIOD OF EXCLUSIVITY: Upon Seller's acceptance of this PURCHASE AGREEMENT, Seller does hereby direct Broker not to advise or present Seller with any subsequent offer received by Broker until after forfeiture by the Buyer or other nullification of this PURCHASE AGREEMENT.

**THIS IS A LEGALLY BINDING DOCUMENT. IF YOU DO NOT UNDERSTAND IT, CONSULT AN ATTORNEY. THE BROKER IS NOT AUTHORIZED AND WILL NOT GIVE LEGAL OR TAX ADVICE OF ANY KIND.**

SELLER:  WEENEEZ, LLC                              BUYER:  LUCKY DOG PIZZA, INC.

X_____                    X_____
By:  Sid Carter, Managing Member                   By:  David McGrath, CEO

Date: 2/21/2010                                    Date: 2/21/10


X_____
By:  Julie Rico, Managing Member

Date: 2/21/2010


6 of 7

Buyer          Seller          Seller          Sell

Seller Seller Buyer

# EXHIBIT B

## LUCKY DOG PIZZA, LLC
## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (this "*Agreement*") is entered into on this __2nd__ day of
__July__, 2010 ("Lucky Dog Pizza Operating Agreement Effective Date" or "LDOA
Effective Date") by and between David A. McGrath, an individual residing in California; Margaret
McGrath, an individual residing in California; D & M Restaurant Group, Inc., a corporation organized
under the laws of the State of California; Lucky Dog Pizza, LLC, a limited liability company organized
under the laws of the State of California; and Prism Ventures Holdings, LLC, a limited liability
company organized under the laws of the State of California

### *RECITALS*

WHEREAS, David A. McGrath and Margaret McGrath were the holders of all of the issued and
outstanding shares of Lucky Dog Pizza, Inc.; and

WHEREAS, Lucky Dog Pizza, Inc. (as converted to Lucky Dog Pizza, LLC) is purchasing substantially
all of the assets of Weeneez, LLC, whose members include Sid Carter and Julie Rico, and entering into a
set of transactions therewith related to the purchase by Lucky Dog Pizza, Inc. (as converted to Lucky
Dog Pizza, LLC) of assets of Weeneez, LLC; and

WHEREAS, as part of that purchase of assets and related set of transactions, David A. McGrath and
Margaret McGrath have caused Lucky Dog Pizza, Inc., a corporation organized under the laws of the
State of California to be converted on March 10, 2010 to Lucky Dog Pizza, LLC (the "*Company*"), a
limited liability company organized under the laws of the State of California and have further caused
their membership interests in the Company and all rights and obligations thereof to be transferred to D
& M Restaurant Group, Inc., a corporation organized under the laws of the State of California; and

WHEREAS, D & M Restaurant Group, Inc. now wishes that Prism Ventures Holdings, LLC join Lucky
Dog Pizza, LLC as a limited liability company member in accordance with the terms and conditions of
this Agreement; and

WHEREAS, D & M Restaurant Group, Inc. and Prism Ventures Holdings, LLC now wish to provide,
among other things, for membership in and management of the Company, all in accordance with the
terms and conditions of this Agreement;

NOW, THEREFOR, in consideration of the mutual covenants and agreements set forth herein, and for
other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
the parties hereto agree as follows:

### *ARTICLE I*
### *THE COMPANY*

*Section 1.*    This Agreement is a limited liability company operating agreement under and as provided
for in the California Corporations Code.

*Section 2.*    Concurrently with the execution of this Agreement, D & M Restaurant Group, Inc., and Prism Ventures Holdings, LLC, shall become and be the members of the Company, and David A. McGrath and Margaret McGrath resign as members of the Company, relinquishing all rights as members. D & M Restaurant Group, Inc., Prism Ventures Holdings, LLC, and any other individual, corporation or other entity that becomes a member of the Company in accordance with the terms of this Agreement shall each hereinafter be a *"Member"*, and collectively the *"Members"*. The Members shall also be the mangers (each hereinafter a *"Manager"*, and collectively the *"Managers"*) of the Company.

*Section 3.*    The Company shall have perpetual existence.

*Section 4.*    The business of the Company shall be restaurant management and such other activities as the Members approve in writing.

*Section 5.*    The Company shall continue to operate and do business as Weeneez until such time as the Members approve a change in the operations in writing.

*Section 6.*    The Company may change its operations in order to produce a better return on investment.

## ARTICLE II
## MEMBERSHIP INTERESTS

*Section 1.*    The Members shall have the interests in the profits and losses of the Company as indicated in Exhibit 1 of this Operating Agreement:

*Section 2.*    Items of income, gain, loss, deduction, expense, credit and similar items shall be allocated among the Members in accordance with their interests in the profits and losses of the Company.

*Section 3.*    The profits and losses of the Company and items of income, gain, loss, deduction, expense, credit and similar items shall be determined by the Company's accountants in accordance with generally accepted accounting principles and their determination shall be final, binding and conclusive on all parties in interest, absent fraud or manifest error.

*Section 4.*    Except to the extent approved by the Members, a Member shall not be entitled to salary or other compensation for services rendered to the Company.

*Section 5.*    The Company shall be treated as a partnership for federal income tax purposes and, wherever possible, for state and local income tax purposes. Any other determinations or elections for federal, state or local income tax purposes shall be made by the Members.

### ARTICLE III
### MANAGEMENT OF THE COMPANY

**Section 1.**    The business and affairs of the Company shall be managed by all of the Manager-Members in accordance with this Agreement.

**Section 2.**    Except as otherwise specified in this Agreement, actions (including any approval, decision or determination) by the Manager-Members shall be determined by the decision of Manager-Members representing ownership of more than fifty percent (50%) of the membership interests of the Company.   Actions by the Manager-Members shall be recorded in a written instrument signed by Manager-Members representing ownership of more than fifty percent (50%) of the membership interests of the Company.

**Section 3.**    The Company shall not take any of the following actions or allow such actions to be taken without the unanimous written agreement of the Manager-Members:
a.    assume any debt;
b.    allow the debt-to-equity ratio of the Company to exceed 100 percent (100%);
c.    allow projected debt service of the Company to exceed ten percent (10%) of the average earnings before interest and taxes (i.e., EBIT) of the Company for the two preceding fiscal quarters at any time;
e.    issue any membership interests, accept any equity investment or admit any Members, except as provided in this Agreement;
f.    make any expenditures for capital assets;
g.    sell any capital asset of the Company;
h.    sell substantially all of the assets of the Company;
i.    merge the Company with any other company;
j.    institute any proceeding seeking to adjudicate the Company bankrupt or insolvent, or seeking dissolution, liquidation, winding-up, reorganization, arrangement, adjustment, protection or relief of the Company from its debts or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for the Company or for any substantial part of its property or assets;
k.    admit the inability of the Company to pay its debts as they come due or make an assignment for the benefit of creditors;
l.    amend this Agreement;
m.    amend the articles of organization of the Company; or
n.    dissolve, liquidate or wind-up the affairs of the Company.

**Section 4.**    The Manager-Members hereby appoint David McGrath as the President of the Company to perform the management tasks listed below in Exhibit 2 and shall not terminate or replace him or substantially diminish his responsibilities as President of the Company without the agreement of all Manager-Members.

**Section 5.**    The Manager-Members hereby agree to employ Julie Rico to perform the management tasks listed below in Exhibit 3 and shall not terminate or replace her or substantially diminish her responsibilities with the Company without the agreement of all Manager-Members.

**Section 6.**    Except as approved unanimously by the Manager-Members, no Member or Manager shall delegate any of its rights or powers to manage and control the business and affairs of the Company, and any attempted delegation in contravention of this Section shall be null and void.

## ARTICLE IV
### FINANCIAL MANAGEMENT AND DISTRIBUTIONS

**Section 1.**    The Manager-Members shall monitor the financial performance of the Company, where such monitoring shall include without limitation:

a.    appointing an accountant and/or bookkeeper for the Company and monitoring such person's performance;

b.    ensuring the accuracy and timeliness of filings and reports to tax and regulatory agencies, including but not limited to, the U.S. Internal Revenue Service, the California Franchise Tax Board, the California Employment Development Department, the California Board of Equalization and the California Department of Alcohol Beverage Control;

c.    developing and properly implementing policy of the Company regarding distributions of dividends to shareholders of the Company in accordance with the following parameters set forth in this Agreement.

**Section 2.**    The Manager-Members shall cause the Company to distribute dividends to Members of the Company on a bi-monthly basis accordingly:

a.    In an amount equal to fifty percent (50%) of earnings before interest, taxes, depreciation and amortization (i.e., EBITDA) of the Company, *provided* that prior to any such distribution the retained earnings of the Company are less than Fifty Thousand Dollars ($50,000) and

b.    In an amount equal to seventy-five percent (75%) of earnings before interest, taxes, depreciation and amortization (i.e., EBITDA) of the Company, *provided* that prior to any such distribution the retained earnings of the Company exceed Fifty Thousand Dollars ($50,000) and

c.    In an amount such that annual distributions shall not exceed One Hundred Fifty Thousand Dollars ($150,000).

## ARTICLE V
### MEMBERSHIP

**Section 1.**    No Member shall resign from the Company prior to the dissolution and winding up of the Company without the unanimous approval of the Members. No Member shall be expelled from the Company, except for fraud or intentional wrongdoing against the Company as reasonably determined unanimously by the Members not being considered for expulsion from the Company.    Except as provided in this Agreement, no person shall become a member of the Company unless that person's admission is unanimously approved by the existing Members and an amendment to this Agreement signed by all of the existing Members and by that person.

**Section 2.**    No Member shall sell, assign, transfer, pledge, hypothecate, encumber, grant any option or other right to acquire or in any other manner dispose of any of its membership interests in the

Company without the unanimous approval of the other Members and any such action attempted shall be null and void.

**Section 3.**    A permitted transferee (other than the Company) of a Member's interest in the Company pursuant to the provisions of this Agreement is a *"Transferee"*. A Transferee that is not a Member of the Company at the time of the transfer shall, without further act, become and be a Member of the Company. A Transferee shall be subject to the terms and provisions of this Agreement, shall be entitled to all the rights and benefits of the transferor (a *"Transferor"*) to the extent of the interest transferred, including, without limitation, the right to participate in management, and shall be subject to all of the obligations of the Transferor to the extent of the interest transferred; but a Transferee that is not a signatory to this Agreement at the time of the transfer shall not be entitled to receive any distributions unless and until that Transferee executes this Agreement by signing an instrument in the form determined by the Company.

**Section 4.**    If a Member transfers any of its interest in the Company as permitted by this Agreement, all of the Members shall enter into an amendment to this Agreement in the form determined by the Company reflecting the allocation of the Members' contributions following the transfer and the changes in the ownership of the profits and losses of the Company resulting from the transfer. Unless the Members otherwise approve in writing, the rights and benefits to which the Transferee will be entitled and the obligations to which the Transferee will be subject shall include rights to profits and losses and items of income, gain, loss, deduction, expense, credit and similar items for the fiscal year in which the transfer occurs and, without releasing the Transferor from liability for the same, obligations accrued at the time of the transfer.

**Section 5.**    The initial sale of membership interest of the Company to the initial members of the Company has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended, in reliance upon exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of shares of the Company under the California Corporate Securities Law of 1968, as amended, also in reliance upon an exemption from the requirement that a permit for issuance of securities be procured. Notwithstanding any other provision of this Agreement, membership interest of the Company shall not be transferred or encumbered unless registered or qualified under applicable state and federal securities law or unless in the opinion of legal counsel satisfactory to the Company such qualification or registration is not required. A person obtaining membership interests in the Company shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE VI
## OPTION ON INTERESTS

**Section 1.**    The death or dissolution of a Member or the occurrence of any other event that terminates the membership of a Member in the Company shall not in itself cause the dissolution and winding up of the Company.

**Section 2.**    Immediately upon the occurrence of any of the following events with respect to a Member, the Members shall automatically and without any further thing being done have an option (the *"Option"*) to purchase all or any portion of the membership interests of the Company of such Member at the Purchase Price (as defined below in this Article):

a.      death,
b.      incapacity,
c.      bankruptcy,
d.      winding-up,
e.      dissolution,
f.      merger or other company reorganization,
g.      issuance by any court in connection with the divorce or dissolution of the marriage of a Member of a decree or order that transfers, confirms or awards any membership interests in the Company to the spouse of that shareholder of the Company, or
h.      any other event that is or that would cause a breach of Section 2 of Article 5 of this Agreement.

**Section 3.**      Pursuant to the Option, the remaining Members shall have the option, for a period ending thirty (30) calendar days following the determination of the Purchase Price to purchase the membership interests of the Company subject to the Option, at the Purchase Price and on the terms provided in this Agreement, pro rata in accordance with their prior membership interest of the Company. If all of the remaining Members do not elect to purchase the entire membership interest of the Company subject to the Option, then all of the Members shall again have the right, pro rata in accordance with their prior membership interest of the Company, to purchase the remaining membership interests of the Company available for purchase. Any membership interest of the Company that are not purchased pursuant to the Option and all rights associated therewith shall automatically terminate.

**Section 4.**      The purchase price (the "**Purchase Price**") of the membership interest of the Company that are the subject the Option shall be the fair market value of such membership interest as determined under this Section. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the fair market value. If the parties are unable to so agree within thirty (30) days of the date on which the option is first exercisable (the "**Option Date**"), the selling party shall appoint, within forty (40) days of the Option Date, one appraiser, and the purchasing party shall appoint within forty (40) days of the Option Date, one appraiser. The two appraisers shall within a period of five (5) additional days, agree on and appoint an additional appraiser. The three appraisers shall, within sixty (60) days after the appointment of the third appraiser, determine the fair market value of the shares in writing and submit their report to all the parties. The fair market value shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the fair market value. Each purchasing party shall pay for the services of the appraiser selected by it, plus one-half of the fee charged by the third appraiser. The Purchase Price as so determined shall be payable in cash.

### ARTICLE VII
### FIDUCIARY DUTY, INDEMNITY

**Section 1.**      The Members all hereby acknowledge that Members are in some instances also limited liability company members and/or managers, shareholders, directors and/or officers of other companies and/or corporations involved in the food service, restaurant and/or other industries in which the Company is active and in the same geographic area as the Company, to wit, Weeneez, LLC and D & M Restaurant Group, Inc., and agree that such roles shall not constitute a breach of the fiduciary duty of such Members to the Company.

**Section 2.**    The Company shall indemnify each of its Members and each of its Managers against any claim, demand, liability, fine or expense (including, without limitation, reasonable legal fees and disbursements, court costs and the cost of appellate proceedings) arising out of any act or inaction by the Member or Manager done in good faith and reasonably believed by the Member or Manager to be in the best interests of the Company and *provided*, in the case of any fine, that the Member or Manager had no reasonable cause to believe its conduct was unlawful.

## ARTICLE VIII
## ACCOUNTING BOOKS AND RECORDS

**Section 1.**    The Members and the Managers shall have the right to examine the books and records of the Company at its office during normal hours.  The Company shall maintain its books and records on a **cash** basis.  A unanimous vote by the Members may change the basis for bookkeeping.

**Section 2.**    The Company shall prepare and furnish to its Members quarterly and annual balance sheets and profit and loss statements.  The annual balance sheets and profit and loss statements may be reviewed or audited by independent certified public accountants upon approval by the Members.

**Section 3.**    The Company's fiscal year shall commence on January 1 and end on December 31.

## ARTICLE IX
## WEENEEZ TRANSACTION

**Section 1.**    The Manger-Members shall cause the Company to comply with the obligations of the Company pursuant to those certain two promissory notes in the amounts of Eight Thousand United States Dollars (U.S. $ 8,000) included here as Exhibit 4 and Twenty Seven Thousand United States Dollars (U.S. $ 27,000) included here as Exhibit 5 issued in or about June, 2010

**Section 2.**    The Manger-Members shall cause the Company to reimburse the Members and Weeneez, LLC for any reasonable costs incurred in connection with the transaction or transactions between the Company and Weeneez, LLC and/or the managers, members thereof and related transactions and matters in or about June, 2010, including without limitation attorneys fees, escrow costs and miscellaneous transaction costs.

## ARTICLE X
## MISCELLANEOUS

**Section 1.**    If any provision of this Agreement or the application of any such provision to any individual, limited liability company, corporation or other entity or to any circumstance is held invalid, the remainder of this Agreement, and the application of such provision other than to the extent it is held invalid, shall not be invalidated or affected thereby.

**Section 2.**    This Agreement and the rights and obligations of the Members shall be governed by and construed in accordance with the law of the State of California.  For purposes of any proceeding involving this Agreement or any of the rights or obligations of any of the Members, each Member

hereby submits to the non-exclusive jurisdiction of the courts of the State of California, and agrees not to raise and waives any objection to or defense based upon the venue of any such court or based upon forum non conveniens. Each Member agrees not to bring any action or other proceeding with respect to this Agreement or with respect to any of the rights or obligations of any of the Members in any other court unless such courts of the State of California determine that they do not have jurisdiction in the matter.

**Section 3.**     This Agreement contains the entire understanding of the parties with respect to the subject matter of this Agreement, and supersedes all prior understandings and agreements, whether written or oral, and all prior dealings of the parties with respect to the subject matter hereof.

**Section 4.**     Section headings are for reference purposes only and shall not in any way affect the meaning or interpretation of any provision of this Agreement.

**Section 5.**     This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute one and the same instrument.

*[Lucky Dog Pizza, LLC*
*Operating Agreement*
*signature page follows]*

*[Lucky Dog Pizza, LLC*
*Operating Agreement*
*signature page]*

IN WITNESS WHEREOF, the Members, the resigning Members, and the Company have executed this Agreement as of the day and year first written above.

PRISM VENTURES HOLDINGS, LLC              Resigning shareholder, Lucky Dog Pizza, Inc.
                                          MARGARET MCGRATH

_____          _____
Setsu Carter, Managing Member             Margaret McGrath

7/2/2010
_____          _____
Date:                                     Date

D & M RESTAURANT GROUP, INC.              Resigning shareholder, Lucky Dog Pizza, Inc.
                                          DAVID A. MCGRATH

_____          _____
David A. McGrath, President               David A. McGrath

_____          _____
Date                                      Date

9 of 14

*[Lucky Dog Pizza, LLC*
*Operating Agreement*
*signature page]*

IN WITNESS WHEREOF, the Members, the resigning Members, and the Company have executed this Agreement as of the day and year first written above.

PRISM VENTURES HOLDINGS, LLC          Resigning shareholder, Lucky Dog Pizza, Inc.
                                      MARGARET MCGRATH


_____       *Margaret McGrath*
Setsu Carter, Managing Member         Margaret McGrath


_____       7/2/10
Date:                                 Date

PRISM VENTURES HOLDINGS, LLC          Resigning shareholder, Lucky Dog Pizza, Inc.
                                      DAVID A. MCGRATH


_____       _____
Julie Rico, Managing Member           David A. McGrath


_____       7/2/10
Date                                  Date

D & M RESTAURANT GROUP, INC.


_____
David A. McGrath, President


_____
Date:


9 of 14
LUCKY DOG PIZZA, LLC OPERATING AGREEMENT AND EXHIBITS 1-3

# EXHIBIT C

FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.

## SHAREHOLDERS AND CREDITOR AGREEMENT

This Shareholders and Creditor Agreement (this *"Agreement"*) is entered into on this 2nd day of **July, 2010 ("Shareholders and Creditor Agreement Effective Date" or "SACA Effective Date")** by and among D & M Restaurant Group, Inc., a corporation organized under the laws of California (the *"Corporation"*), David McGrath, an individual residing in California, Margaret McGrath, an individual residing in California, and Setsu Carter, an individual residing in California.

## *RECITALS:*

David McGrath and Margaret McGrath (each hereinafter a *"Shareholder"*) are the shareholders of the Corporation. Setsu Carter (the *"Creditor"*) is the holder of a promissory note issued by the Corporation in the amount of One Hundred Twelve Thousand Five Hundred United States Dollars (US$112,500) (the *"Note"*). The Corporation, the Shareholders and the Creditor wish to enter into an agreement regarding the management, control and ownership of the Corporation.

NOW, THEREFOR, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## *ARTICLE I*
## *CREDITOR TO BE DIRECTOR*

The Shareholders shall vote their shares and do all things necessary to elect the Creditor as a director of the Corporation and to cause the Creditor to remain and/or be re-elected as a director of the Corporation continuously for the term of this Agreement.

## *ARTICLE II*
## *DIRECTOR UNANIMITY*

The Shareholders shall vote their shares and do all things necessary to ensure that the Corporation does not take any of the following actions without the unanimous agreement of the directors of the Corporation during the term of this Agreement:

a.    assume any debt;
b.    allow the debt-to-equity ratio of the Corporation to exceed one hundred percent (100%);
c.    allow projected debt service of the Corporation to exceed ten percent (10%) of the average gross earnings of the Corporation for the two preceding fiscal quarters at any time;
d.    issue any stock, accept any equity investment or admit any shareholders, except as expressly provided in this Agreement;
e.    make any expenditure for capital assets;
f.    sell any capital asset of the Corporation;

1 of 8

g.  sell substantially all of the assets of the Corporation;

h.  merge the Corporation with any other company;

i.  institute any proceeding seeking to adjudicate the Corporation bankrupt or insolvent, or seeking dissolution, liquidation, winding-up, reorganization, arrangement, adjustment, protection or relief of the Corporation from its debts or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for the Corporation or for any substantial part of its property or assets;

j.  admit the inability of the Corporation to pay its debts as they come due or make an assignment for the benefit of creditors; or

k.  amend the by-laws of the Corporation.

## ARTICLE III
## TRANSFERS OF SHARES

**Section 3.1.** No shareholder of the Corporation shall sell, assign, transfer, pledge, hypothecate, encumber, grant any option or other right to acquire or in any other manner dispose of any of its shares of the Corporation without the unanimous prior written consent of the Shareholders and Creditor and any such action attempted shall be null, void and of no effect.

**Section 3.2.** Immediately upon the occurrence of any of the following events with respect to a shareholder of the Corporation, the Corporation and the shareholders of the Corporation shall automatically and without any further thing being done have an option (the "*Option*") to purchase all or any portion of the shares of the Corporation of such shareholder of the Corporation at the Purchase Price (as defined in Section 3.4):

a.  death,

b.  incapacity,

c.  bankruptcy,

d.  winding up,

e.  dissolution,

f.  merger or other company reorganization,

g.  issuance by any court in connection with the divorce or dissolution of the marriage of a shareholder of the Corporation of a decree or order that transfers, confirms or awards any shares of the Corporation to the spouse of that shareholder of the Corporation, or

h.  any other event that is or that would cause a breach of Section 3.1 of this Agreement.

**Section 3.3.** Pursuant to the Option, the Corporation shall have the option, for a period ending thirty (30) calendar days following the determination of the Purchase Price to purchase the shares of the Corporation to which the Option relates, at the Purchase Price and on the terms provided in this Agreement, and the remaining shareholders of the Corporation, pro rata in accordance with their prior shareholding of the Corporation, shall then have the option, for a period of thirty (30) days thereafter, to purchase the shares of the Corporation not purchased by the Corporation, on the same terms and conditions as apply to the Corporation.  If all of the remaining shareholders of the Corporation do not elect to purchase the entire remaining shares of the Corporation, then the shareholders of the Corporation having elected to purchase shall have the

2 of 8

right, pro rata in accordance with their prior shareholding of the Corporation, to purchase the additional shares of the Corporation available for purchase. The transferee of any shares of the Corporation that are not purchased pursuant to the Option shall hold such shares of the Corporation subject to all of the provisions of this Agreement.

**Section 3.4.** The purchase price (the ***"Purchase Price"***) of the shares of the Corporation that are the subject the Option shall be the Fair Market Value of such shares as determined under this Section. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the Fair Market Value. If the parties are unable to so agree within thirty (30) days of the date on which the option is first exercisable (the ***"Option Date"***), the selling party shall appoint, within forty (40) days of the Option Date, one appraiser, and the purchasing party shall appoint within forty (40) days of the Option Date, one appraiser. The two appraisers shall within a period of five (5) additional days, agree on and appoint an additional appraiser. The three appraisers shall, within sixty (60) days after the appointment of the third appraiser, determine the Fair Market Value of the shares in writing and submit their report to all the parties. The Fair Market Value shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Market Value. Each purchasing party shall pay for the services of the appraiser selected by it, plus one-half of the fee charged by the third appraiser. The Purchase Price as so determined shall be payable in cash.

**Section 3.5.** In the event that any shares of the Corporation or any interest in such shares are transferred as permitted by this Agreement, the transferee of such shares or interests shall be bound by the terms of this Agreement with respect to the shares or interests so transferred.

**Section 3.6.** The initial sale of shares of the Corporation to the initial shareholders of the Corporation has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended, in reliance upon exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of shares of the Corporation under the California Corporate Securities Law of 1968, as amended, also in reliance upon an exemption from the requirement that a permit for issuance of securities be procured. Notwithstanding any other provision of this Agreement, shares of the Corporation shall not be transferred or encumbered unless registered or qualified under applicable state and federal securities law or unless in the opinion of legal counsel satisfactory to the Corporation such qualification or registration is not required. The shareholder of the Corporation obtaining the shares of the Corporation pursuant to the Option shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IV
## FINANCIAL MANAGEMENT AND DIVIDENDS

**Section 4.1.** The Shareholders shall vote their shares and do all things necessary to cause the directors of the Corporation to monitor the financial performance of the Corporation, with such monitoring to include without limitation:

a.      appointing an accountant and/or bookkeeper for the Corporation and monitoring such person's performance;

b.    ensuring the accuracy and timeliness of filings and reports to tax and regulatory agencies, including but not limited to, the U.S. Internal Revenue Service, the California Franchise Tax Board, the California Employment Development Department, the California Board of Equalization and the California Department of Alcohol Beverage Control;

c.    developing and properly implementing policy of the Corporation regarding distributions of dividends to shareholders of the Corporation in accordance with the following parameters set forth in Section 4.2 of this Agreement.

*Section 4.2.* The Shareholders shall vote their shares and do all things necessary to cause the Corporation to distribute dividends to shareholders of the Corporation on a bi-monthly basis accordingly:

a.    In an amount equal to fifty percent (50%) of earnings before interest, taxes, depreciation and amortization (i.e., EBITDA) of the Company, *provided* that prior to any such distribution the retained earnings of the Company are less than Fifty Thousand Dollars ($50,000) and

b.    In an amount equal to seventy-five percent (75%) of earnings before interest, taxes, depreciation and amortization (i.e., EBITDA) of the Company, *provided* that prior to any such distribution the retained earnings of the Company exceed Fifty Thousand Dollars ($50,000) and

c.    In an amount such that annual distributions shall not exceed Two Hundred Fifty Thousand Dollars ($250,000).

### ARTICLE V
### WEENEEZ TRANSACTION

*Section 5.1.* The Shareholders shall vote their shares and do all things necessary to cause the directors of the Corporation to comply with the obligations of the Corporation pursuant to that certain promissory note in the amount of One Hundred Twelve Thousand Five Hundred United States Dollars (U.S. $112,500) issued to the Creditor on or about even date with this Agreement, as described in the following instrument:

EXHIBIT ONE TO
FIRST AMENDMENT TO BY-LAWS OF D&M RESTAURANT GROUP, INC.
SHAREHOLDERS AND CREDITOR AGREEMENT

NON-NEGOTIABLE PROMISSORY NOTE
ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED UNITED STATES DOLLARS
U.S. $112,500.00

4 of 8

*Section 5.2.* The Shareholders shall vote their shares and do all things necessary to cause the
Corporation to reimburse the Shareholders, the Creditor and Weeneez, LLC for any reasonable
costs incurred in connection with the transaction or transactions between the Corporation and
Weeneez, LLC and/or the managers, members thereof and related transactions and matters on or
about even date with this Agreement, including without limitation attorneys fees, escrow costs
and miscellaneous transaction costs.

## ARTICLE VI
### PRESIDENT OF THE CORPORATION

*Section 6.1.* The Shareholders shall vote their shares and do all things necessary to cause the
directors of the Corporation to appoint David McGrath as the President of the Corporation and
shall not terminate or replace him or substantially diminish his responsibilities as President of the
Corporation without the unanimous agreement of the directors of the Corporation.

*Section 6.2.* The Shareholders shall vote their shares and do all things necessary to cause the
directors of the Corporation to designate David McGrath the President of the Corporation in
order that he may perform the following management tasks and to cause any action not included
within the following list of management tasks and responsibilities to require the unanimous
agreement of the directors of the Corporation:
a.    development of product offerings,
b.    creation, development and management of staff,
c.    purchase of inventory,
d.    maintenance of outstanding customer service standards,
e.    effecting of repairs and maintenance at a cost not to exceed Two Thousand
      Dollars ($2,000) monthly or Five Thousand Five Hundred Dollars ($5,500)
      annually,
f.    maintenance current of operational licenses and permits including a California
      Department of Alcohol Beverage Control license and a Los Angeles County
      Health Department license,
g.    management of operational banking relationships of the Corporation,
h.    reporting of financial performance of the Corporation to the Corporation's
      accountant and directors, including submitting monthly to the accountant or
      bookkeeper of the Corporation: (i) sales and cost reports from the Micros system,
      (ii) payroll reports, and (iii) bank statements, and
i.    producing reports and making associated payments for the Corporation to
      regulatory agencies, including but not limited to, the U.S. Internal Revenue
      Service, the California Franchise Tax Board, the California Employment
      Development Department and the California Board of Equalization.

### ARTICLE VII
### MISCELLANEOUS

**Section 7.1.** The Shareholders shall vote their shares and do all things necessary to cause the business operated by the Corporation at 118 W. 5th Street, Los Angeles CA 90013 to operate pursuant to the fictitious name or DBA: "JP Lounge".

**Section 7.2.** Any Shareholder in breach of this Agreement shall defend, indemnify and hold harmless the Corporation, the other Shareholders and the Creditor for any loss, expense or damage suffered as a result of such breach, including without limitation reasonable attorneys fees.

**Section 7.3.** This Agreement shall be effective as of the date first written above and shall continue in force for the lifetime of the Corporation or until otherwise agreed in writing by all the parties hereto.

**Section 7.4.** Any action to enforce or interpret this Agreement or to resolve disputes between or among the any parties hereto shall be resolved exclusively by arbitration in accordance with the rules of the American Arbitration Association. Any party hereto may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at Los Angeles, California. The parties to the arbitration shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding and conclusive on all parties thereto. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof.

**Section 7.5.** This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. All obligations provided under this Agreement are personal and no party hereto shall assign any rights or delegate any obligations hereunder without the prior written consent of the other parties hereto. Any attempted assignment by any party hereto without the required consent from the other parties shall be null and void.

**Section 7.6.** This Agreement shall be governed by and construed in accordance with the laws of California, without regard to its conflict of law rules. Each party hereto hereby agrees that any party hereto shall be entitled to enforce any or all of the obligations contained in this Agreement by injunctive or other equitable relief, in addition to any other relief to which it may be entitled. If one or more provisions of this Agreement is adjudged to be invalid or unenforceable such provision shall be omitted, or upon the request of any party hereto, reformed and construed in a valid and enforceable manner to the maximum extent permitted by law. All other provisions shall continue without regard to any omitted or reformed provision. This Agreement contains the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior written or oral agreements, contracts or promises between the parties hereto with respect to such subject matter. No provision of this Agreement shall be deemed modified, amended, waived or revoked except by a writing signed by all parties hereto. The failure by any party hereto at any time or from time to time to require performance by the other parties of any

6 of 8

provision hereof shall in no manner affect the right of the first party thereafter to enforce such provision. This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute one and the same instrument.

*[signature page follows]*

FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.
SHAREHOLDERS AND CREDITOR AGREEMENT

*[D & M Restaurant Group, Inc. Shareholders and Creditor Agreement signature page]*

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date first set forth above.


_____          _____
David A. McGrath, Shareholder             Setsu Carter, Creditor




_____
Margaret McGrath, Shareholder

8 of 8

*[D & M Restaurant Group, Inc. Shareholders and Creditor Agreement signature page]*

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date first set forth above.


_____          _____
David A. McGrath, Shareholder              Setsu Carter, Creditor



_____
Margaret McGrath, Shareholder

FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.
SHAREHOLDERS AND CREDITOR AGREEMENT

# EXHIBIT D

Exhibit 5 To

**Lucky Dog LLC Operating Agreement**

**NON-NEGTIABLE PROMISSORY NOTE (One OF Three)**

**TWENTY-SEVEN THOUSAND UNITED STATES DOLLARS**

**U.S. $27,000.00**

Los Angeles, California, U.S.A

Applicable Closing Date: Lucky Dog Pizza Operating Agreement Effective Date

**Section 1.        Amount; Interest Rate**

FOR VALUE RECEIVED, the undersigned, Lucky Dog Pizza, LLC ("*Promissor*"), a limited liability company organized and existing under the laws of California, with offices at 8640 Gulana Ave., Playa del Rey, California, 90293, promises to pay to the order of Setsu Carter ("*Holder*"), with offices at 4571 Don Felipe Dr., Los Angeles, California, 90008, the principal sum of twenty seven thousand United States dollars (U.S. $27,000.00), and interest on the outstanding principal balance computed commencing on the effective date hereof at the rate of ten percent (10%) *per annum* in accordance with the provisions of this Non-Negotiable Promissory Note (this "*Note*").

**Section 2.        Payment Schedule**

The principal amount of this Note and interest accrued thereon shall be payable in thirty six (36) equal installments as follows: eight hundred seventy United States dollars (U.S. $870.00) on the fifteenth (15th) day of each month commencing on the (15th) day of the month prevailing one hundred and eighty (180) days after the Closing of the instant transaction, signified by the Closing Date indicated above, with the final balance payable in full on the fifteenth (15th) day of the thirty-sixth (36th) month, presently estimated to be December 15, 2013.

**Section 3.        Default**

If any of the following events shall occur, the outstanding principal balance of this Note together with accrued interest thereon shall, on demand by Holder, be due and payable: any amount owing under this Note is not paid when due; a default under any other provision of this Note or under any guarantee or other agreement providing security for the payment of this Note; a breach of any representation or warranty under this Note or under any such guarantee or other agreement; the liquidation, dissolution, death or incompetence of

Promissor or any individual, corporation, partnership or other entity guaranteeing or providing security for the payment of this Note; the sale of a material portion of the business and assets of Promissor or any corporation, partnership or other entity guaranteeing or providing security for the payment of this Note; the filing of a petition under any bankruptcy, insolvency or similar law by Promissor or by any individual, corporation, partnership or other entity guaranteeing or providing security for the payment of this Note; the making of any assignment for the benefit of creditors by Promissor or by any individual, corporation, partnership or other entity guaranteeing or providing security for the payment of this Note; the filing of a petition under any bankruptcy, insolvency or similar law against Promissor or against any individual, corporation, partnership or other entity guaranteeing or providing security for the payment of this Note and such petition not being dismissed within a period of thirty (30) days of the filing.  In the event that any amount owing under this Note is not paid within thirty (30) days after such amount has become due, Holder shall have the right to capitalize the interest portion of the missed payment.

**Section 4.     Default Interest**

The outstanding balance of any amount owing under this Note that is not paid when due shall bear interest at the rate of ten percent (10%) *per annum* above the interest rate that would otherwise be in effect under this Note.

**Section 5.     Usury Clause**

Notwithstanding any other provision of this Note, interest under this Note shall not exceed the maximum rate permitted by law; and if any amount is paid under this Note as interest in excess of such maximum rate, then this Note shall remain in full force and effect.  Any amounts paid in excess of such maximum rate shall not constitute interest but shall constitute a prepayment on account of the principal amount of this Note.

**Section 6.     Where to Make Payments**

All payments of principal and interest shall be made in lawful currency of the United States of America in immediately available funds before 11:00 a.m. Pacific Standard Time on the due date thereof at [*address*], U.S.A., for the account of [*entity name*], account number [*account number*], or in such other manner or at such other place as Holder designates in writing.

**Section 7.     Non-Negotiability**

**THIS NOTE SHALL BE A NON-NEGOTIABLE PROMISSORY NOTE AND SHALL NOT BE GOVERNED BY DIVISION 3 OF THE CALIFORNIA COMMERCIAL CODE OR THE EQUIVALENT LAWS OF ANY OTHER JURISDICTION.**

**Section 8.**       **Security**

Until the principal and interest owed under this Note have been paid in full, this Note shall
be secured by security interest pursuant to a certain Security Agreement between Promissor
and Holder entered into on even date herewith or upon demand by Holder and may
incorporate a California Commercial Code financing statement giving Holder a claim on all
assets of Promissor. Promissor shall execute all instruments and do all things necessary or
useful for the perfection of said security interest.

**Section 9.**       **Tax Gross Up**

All payments under this Note shall be made without defense, set-off or counterclaim, free
and clear of and without deduction for any taxes of any nature now or hereafter imposed.
Should any such payment be subject to any tax, Promissor shall pay to Holder such
additional amounts as may be necessary to enable Holder to receive a net amount equal to
the full amount payable hereunder. As used in this paragraph, the term "tax" means any tax,
levy, impost, duty, charge, fee, deduction, withholding, turnover tax, stamp tax and any
restriction or condition resulting in a charge imposed in any jurisdiction upon the payment
or receipt of any amount under this Note other than taxes on the overall net income of
Holder under the laws of California or of the United States of America.

**Section 10.**       **Expenses**

Promissor agrees to pay on demand all expenses of collecting and enforcing this Note and
any guarantee or collateral securing this note, including, without limitation, expenses and
fees of legal counsel, court costs and the cost of appellate proceedings.

**Section 11.**       **Governing Law; Forum**

This Note and the obligations of Promissor shall be governed by and construed in
accordance with the law of the State of California, U.S.A. For purposes of any proceeding
involving this Note or any of the obligations of Promissor hereunder, Promissor hereby
submits to the exclusive jurisdiction of the courts of the State of California and of the United
States having jurisdiction in the County of Los Angeles, State of California, and agrees not
to raise and waives any objection to or defense based upon the venue of any such court and
any objection or defense based upon *forum non conveniens*. Promissor hereby agrees not to
bring any action or other proceeding with respect to this Note or with respect to any of its
obligations hereunder in any other court unless such courts of the county of Los Angeles,
State of California and of the United States determine that they do not have jurisdiction in
the matter.

**Section 12.**       **Waiver of Presentment, Etc.**

Promissor hereby waives presentment for payment, demand, protest and notice of protest
and of non-payment.

**Section 13.      Delay; Waiver**

The failure or delay by Holder in exercising any of its rights hereunder in any instance shall not constitute a waiver thereof in that or any other instance. Holder shall not waive any of its rights under or in connection with this Note except by an instrument in writing signed by Holder.

**Section 14.      Prepayment**

Promissor shall have the right to prepay all or any portion of the principal of this Note at any time and from time to time without premium or penalty. Any such prepayment shall be applied against the installments of principal due under this note in the inverse order of their maturity and shall be accompanied by payment of accrued interest on the amount prepaid to the date of prepayment.

**Section 15.      Amendment**

This Note may not be amended without the written approval of Holder.

*[signature page follows]*

Exhibit 5 To Lucky Dog LLC OA – Non-negotiable Promissory Note 1 of 3 US$ 27,000

*[Exhibit 5 To Lucky Dog LLC Operating Agreement – Non-negotiable Promissory Note U.S. $ 27,000*

*signature page]*

PROMISSOR:  LUCKY DOG PIZZA, LLC

Date:___7/2/10___            By:_____

David McGrath, Managing Member

HOLDER:  SETSU CARTER

Date:___7/2/2010___          By:_____

Setsu Carter, Holder and Creditor

# EXHIBIT E

EXHIBIT TWO TO
FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.

SHAREHOLDERS AND CREDITOR AGREEMENT

OPTION OF THE HOLDER OF THE NON-NEGOTIABLE PROMISSORY NOTE FOR

ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED UNITED STATES DOLLARS

U.S. $112,500.00

TO EXCHANGE THE U.S.$ 112,500 NOTE FOR FORTY-NINE PERCENT OF THE OUTSTANDING

COMMON SHARES OF D&M RESTAURANT GROUP, INC.

This Agreement is entered into on the **Shareholders and Creditor Agreement Effective
Date** by and among the undersigned, D&M Restaurant Group, Inc., (the *"Corporation"*) a
corporation organized and existing under the laws of California, with offices at 8640 Gulana
Ave., Playa del Rey, California, 90293, and Setsu Carter (*"Option Owner"*), with offices at 4571
Don Felipe Dr., Los Angeles, California, 90008. Setsu Carter is the holder of a promissory note
issued by the Corporation in the amount of One Hundred Twelve Thousand Five Hundred United
States Dollars (U.S. $ 112,500) (the *"Note"*), designated as

EXHIBIT ONE TO
FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.
SHAREHOLDERS AND CREDITOR AGREEMENT

NON-NEGOTIABLE PROMISSORY NOTE
ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED DOLLARS

The Corporation and the Option Owner wish to enter into an agreement regarding the exchange
of the Note for forty-nine percent of the outstanding common shares of the Corporation (the
*"Option Agreement"*).

<div align="center">

SECTION 1

NOTICE OF GRANT OF

THE OPTION TO EXCHANGE THE U.S. $112,500 NOTE FOR

FORTY-NINE PERCENT OF THE OUTSTANDING COMMON SHARES OF

D&M RESTAURANT GROUP, INC.

</div>

Corporation does hereby grant to Option Owner an option to purchase forty-nine per cent of the outstanding shares of the common stock of Corporation as specified below (the "*Option*").

The The Option is subject to and may be exercised only in accordance with the "Terms and Conditions of the Option to exchange the U.S.$112,500 note for forty-nine percent of the outstanding common shares of D&M Restaurant Group, Inc." attached hereto and a part of this Notice of Grant.

| | | |
|---|---|---|
| 1.1 | Date of Grant: | **Shareholders and Creditor Agreement Effective Date** |
| 1.2 | Total Number of Shares Granted ("Shares"): | Forty-nine percent of outstanding shares of common stock of D&M Restaurant Group, Inc. at time of exercise. |
| 1.3 | Total Exercise Price: | One United States Dollar (U.S. $1.00) |
| 1.3 | Option Expiration Date: | Last day of month prevailing seven years after date of grant |
| 1.5 | Vesting Condition: | This Option shall be immediately exercisable and the Option Owner shall be fully vested with the rights, benefits, and responsibilities enjoyed by shareholders as described in Section 2.3 of the instant Notice of Grant upon the exercise of the instant option, as described in Section 2.5 of the Notice of Grant. |

<div align="center">

2 of 12

EXHIBIT TWO TO FIRST AMENDMENT TO BY-LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

</div>

## SECTION 2

### TERMS AND CONDITIONS OF

### THE OPTION TO EXCHANGE THE U.S. $112,500 PROMISSORY NOTE FOR

### FORTY-NINE PERCENT OF THE

### OUTSTANDING COMMON SHARES OF D&M RESTAURANT GROUP, INC.

This statement of terms and conditions, together with the accompanying Section 1, Notice of Grant, comprise the Option Agreement.

2.1.  <u>Term of Option</u>.  Option Owner may exercise the Option and purchase forty-nine percent of the shares of common stock of D&M Restaurant Group, Inc. that are outstanding at the time of exercise, as indicated in Section 1 of the instant document, Notice of Grant, by properly expressing the demand to exercise the Option as described in Section 3 of the instant document, Notice of Exercise of Stock Option, prior to the last day of the month prevailing seven years after Date of Grant, which is the same date as the **Shareholders and Creditor Agreement Effective Date**

2.2.  <u>Exercise of Option</u>.  The Option shall be exercised by a promise from Option Owner to pay to the Corporation the full exercise payment of one United States dollar (U.S. $ 1.$^{00}$) and a written or electronic notice in a form satisfactory to the Corporation, indicated in Section 3 hereof, signed by Option Owner specifying the demand to exercise.

Notification to Corporation regarding exercise of Option shall be served to David McGrath, the President of the Corporation, or his successor or designee, accordingly:

E-mail:

**Davidmcgrath2@mac.com**

Address:

**David McGrath
D&M Restaurant Group, Inc.
118 West 5th Street
Los Angeles, CA 90013**

or in a manner agreed to in writing by both Corporation and Option Owner.

3 of 12

EXHIBIT TWO TO FIRST AMENDMENT TO BY-LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

Payment may be made by a personal check, cashier's check, money order, or wiring of funds. Common stock certificates for the shares of commons stock of D&M Restaurant Group, Inc. purchased pursuant to the exercise of the option shall be issued as soon as practicable, but no fractional shares shall be delivered.

2.3.  Certain Rights associated with Exercise of Option

2.3.1.  As a holder of the Option, Option Owner shall have all the rights of a shareholder with respect to the shares associated with this option only after such shares have been issued to Option Owner, respective successors, or permitted assignees upon the exercise of the Option.

2.3.2.  Provisions and rights of Article 1 of Shareholders and Creditor Agreement, *Creditor to be Director*, shall inure to the benefit and advantage of the Option Owner and respective successors and permitted assignees, as shareholders upon exercise of the Option.

2.3.3.  Provisions and rights of Article 2 of Shareholders and Creditors Agreement, Director Unanimity, shall inure to the benefit and advantage of the Option Owner and respective successors and permitted assignees, as shareholders upon exercise of the Option.

2.4.  Transferability of Option.  This option shall be transferable according to will, the laws of descent, and distribution. Furthermore, this Option shall be transferred to Sid Carter upon written demand by Option Owner via e-mail or certified mail using the notice of service information specified in Section 2.2 above. If Option Owner dies or is disabled prior to exercise of this Option, then this Option shall automatically transfer to Sid Carter unless other provisions have been made by the Option Owner.

2.5.  Compliance with Law.

2.5.1.  Notwithstanding any of the provisions hereof, the Option Owner hereby agrees that he/she will not exercise the Options, and that the Corporation will not be obligated to issue or transfer any shares of Stock to the Option Holder hereunder, if the exercise hereof or the issuance or transfer of such shares shall constitute a violation of any relevant provisions of law, including, without limitation, the Securities Act, the rules and regulations promulgated there under and state securities laws.

2.5.2.  Option Owner represents and warrants to the Corporation that the shares of stock underlying the Option shall be purchased without any intention to sell such shares.

EXHIBIT TWO TO FIRST AMENDMENT TO BY-LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

2.6.   <u>Cancellation of Certain Debt</u>

Any amounts due by the Corporation to the Note Holder pursuant to the specifications in the governing document:

EXHIBIT ONE TO THE FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.

SHAREHOLDERS AND CREDITOR AGREEMENT,

A NON-NEGOTIABLE PROMISSORY NOTE

ONE HUDRED TWELVE THOUSAND FIVE HUNDRED UNITED STATES DOLLARS

are cancelled and forgiven upon the Option Owner's exercise of the Option, and successful fulfillment thereof, as described herein.

2.7.   <u>Miscellaneous</u>

2.7.1.   Any action to enforce or interpret this Agreement or to resolve disputes between or among the any parties hereto shall be resolved exclusively by arbitration in accordance with the rules of the American Arbitration Association. Any party hereto may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at Los Angeles, California. The parties to the arbitration shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding and conclusive on all parties thereto. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof.

2.7.2.   This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. All obligations provided under this Agreement are personal and no party hereto shall assign any rights or delegate any obligations hereunder without the prior written consent of the other parties hereto. Any attempted assignment by any party hereto without the required consent from the other parties shall be null and void.

2.7.3.   This Agreement shall be governed by and construed in accordance with the laws of California, without regard to its conflict of law rules. Each party hereto hereby agrees that any party hereto shall be entitled to enforce any or all of the obligations contained in this Agreement by injunctive or other equitable relief, in addition to any other relief to which it may be entitled. If one or more provisions of this Agreement is adjudged to be

invalid or unenforceable such provision shall be omitted, or upon the request of any party hereto, reformed and construed in a valid and enforceable manner to the maximum extent permitted by law.  All other provisions shall continue without regard to any omitted or reformed provision.  This Agreement contains the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior written or oral agreements, contracts or promises between the parties hereto with respect to such subject matter.  No provision of this Agreement shall be deemed modified, amended, waived or revoked except by a writing signed by all parties hereto.  The failure by any party hereto at any time or from time to time to require performance by the other parties of any provision hereof shall in no manner affect the right of the first party thereafter to enforce such provision.

EXHIBIT TWO TO FIRST AMENDMENT TO BY-LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

**FORMAT FOR NOTICE OF EXERCISE OF STOCK OPTION**

### SECTION 3

### NOTICE OF EXERCISE OF STOCK OPTION

Gentlemen:

     This letter constitutes an unconditional and irrevocable notice that I,

_____ , the Option Owner,

on the _____ day of _____ in the year _____ which date is prior to the

_____ day of _____ in the year _____, the Option Expiration date, do

hereby exercise the Option granted to **Setsu Carter** by D&M Restaurant Group, Inc. a

California corporation (the "Corporation") on the date defined as the **Shareholders and**

**Creditor Agreement Effective Date** in the document

FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.

SHAREHOLDERS AND CREDITOR AGREEMENT

and more fully described by the instrument:

EXHIBIT TWO TO THE
FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.
SHAREHOLDERS AND CREDITOR AGREEMENT

OPTION OF THE HOLDER OF THE NON-NEGOTIABLE PROMISSORY NOTE FOR

ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED UNITED STATES DOLLARS

U.S. $112,500.00

TO EXCHANGE THE U.S. $112,500 NOTE FOR FORTY-NINE PERCENT OF THE OUTSTANDING

COMMON SHARES OF D&M RESTAURANT GROUP, INC.

EXHIBIT TWO TO FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

**FORMAT FOR NOTICE OF EXERCISE OF STOCK OPTION**

By exercising this option I do hereby demand forty-nine percent (49%) of the common shares of D&M Restaurant Group, Inc. that are presently outstanding.

The shares shall be be registered and delivered to the following entity(ies):

[the rest of this page is intentionally blank]

8 of 12

EXHIBIT TWO TO FIRST AMENDMENT TO BY–LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

### First Designated Recipient of D&M Common Shares

Number of Shares: _____ ____ ____ _____ ___

Name: _____

An individual living at

_____

_____

_____

_____

Social Security Number

_____

Telephone Number/E-mail Address

_____

### Second Designated Recipient of D&M Common Shares

Number of Shares: _____

Name: _____

An individual living at

                .

_____

_____

_____

_____

Social Security Number

_____

Telephone Number/E-mail Address

_____

        Option Owner represents that shares are not being acquired with a view to distribution and will not be disposed of in any manner that would involve a violation of applicable securities laws.

**OPTION OWNER:** _____

Date:_____     By:_____
                                          Option Owner

EXHIBIT TWO TO FIRST AMENDMENT TO BY-LAWS OF D&M RESTAURANT GROUP, INC.
OPTION AGREEMENT

By signing this document, Option Owner and the Corporation agree that Option is granted under and governed by the terms and conditions of the Option Agreement.

This Option Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one document.

*[signature page follows]*

11 of 12

*[Exhibit 2 to D & M Restaurant Group, Inc. Shareholders and Creditor Agreement
Option Agreement signature page]*

OPTION OWNER:  SETSU CARTER

Date: _7/2/2010_                   By: _____

                                   Setsu Carter, Option Owner


CORPORATION:  D&M RESTAURANT GROUP, INC.

Date: _7/2/10_                     By: _____

                                   David McGrath, President


12 of 12

# EXHIBIT F

**WEENEEZ LLC**
500 South Spring St.
Los Angeles, CA 90013

2nd day of July, 2010

Lucky Dog Pizza, LLC

Re: Indemnity

Weeneez LLC ("Weeneez") and Lucky Dog Pizza, LLC ("Lucky Dog") are engaged in a transaction whereby Lucky Dog shall buy the assets of Weeneez (the "Transaction").

Following the consummation of the Transaction, Weeneez and Sid Carter hereby agree to indemnify and hold harmless and defend Lucky Dog and D&M Restaurant Group, Inc. ("D&M") from and against any and all claims, demands, actions, losses, costs, damages or expenses asserted against or suffered by Lucky Dog or D&M ("R-City Damages") that arise from or on behalf of any claims, demands, actions or proceedings asserted by R-City, Inc., a California corporation, or any of its shareholders, members, employees, agents, or their respective parents, affiliates, successors or assigns (collectively, the "R-City Parties") in connection with the Transaction until July 2, 2011.

Yours truly,

By: _____
Sid Carter, Managing Member
Weeneez, CEO

By: _____
David McGrath, Managing Member
President, D&M
President, Lucky Dog

Date: __7/2/2010__

Date: __7/2/10__

DM 232

# PROOF OF SERVICE

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

633 West 5th Street, Ste 2800, Los Angeles, CA 90071

A true and correct copy of the foregoing document described as ***MOTION FOR PERMISSION TO PROCEED WITH AVOIDANCE ACTION AND FOR ATTORNEY'S FEES AND COSTS TO BE PAID BY THE BANKRUPTCY ESTATE, DECLARATION OF MARC WEITZ, DECLARATION OF DAVID MCGRATH, AND EXHIBITS*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***8/22/2011,*** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Ian Landsberg      ilandsberg@landsberg-law.com, bgomelsky@landsberg-law.com;ssaad@landsberg-law.com
John J Menchaca (TR)    igaeta@menchacacpa.com, ca87@ecfcbis.com;igaeta@menchacacpa.com
Michael H Raichelson    mhr@cabkattorney.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Marc Weitz      marcweitz@weitzlegal.com

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***8/22/2011,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Thomas E Moore
228 Hamilton Ave 3rd Fl
Palo Alto, CA 94301

Weeneez LLC
2055 NW 29th Ave #6
Portland, OR 97210

Setsu Carter
4571 Don Felipe Drive
Los Angeles, CA 90008

Prism Venture Holdings
c/o Alex Carter
4571 Don Felipe Dr.
Los Angeles, CA 90008

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***Fill in Date Document is Filed,*** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 8/22/11 | Marc Weitz | /s/ Marc Weitz |
|---------|------------|----------------|
| *Date*  | *Type Name* | *Signature*   |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                    **F 9013-3.1.PROOF.SERVICE**